UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JERMAINE DRAKE,

                Petitioner,

                v.                    CAUSE NO.: 3:14-CV-1691-RLM

SUPERINTENDENT,

                Respondent.

OPINION AND ORDER

Jermaine Drake, a prisoner without a lawyer, filed a habeas corpus petition to challenge his conviction for murder under Cause No. 18C02-410-MR-2. After a jury trial, the Delaware Circuit Court sentenced Mr. Drake to 55 years of incarceration.

FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Caffey v. Butler, 802 F.3d 884 (7th Cir. 2015). The Court of Appeals of Indiana summarized the evidence presented at trial:

> Approximately one week before October 2, 2004, Drake informed two of his friends—Jordan Williams and Jordan Quinn—that his in-car television had been stolen. Drake instructed the men to contact him if they learned the whereabouts of the television.
>
> On October 2, 2004, David Adams contacted Chris Masiongale in Yorktown and informed him that he had a television to sell. Adams

1

told Masiongale that he could keep any money over $150 if Masiongale could sell the television. Masiongale agreed and called Quinn later that day regarding the television. Quinn subsequently called Drake and informed him that Masiongale had contacted him about a television. After speaking with Drake, Quinn called Masiongale and arranged a meeting between Masiongale and Drake.

After determining that Quinn would not be able to drive Drake to the meeting, Drake called Williams and informed him that "he knew who stole his tv and asked if Williams would go with him to go get it." Because Williams was at Ronnie Haste's home when he received the call, he and Haste both went to Drake's apartment to pick him up. Williams drove his black Dodge Ram to the apartment because Haste was too intoxicated to drive. After picking up Drake, the three men drove to the arranged meeting place.

Masiongale, Adams, Kirt Trahan, and Masiongale's girlfriend, Lyndsey Scott, were outside Adams's home when a black Dodge Ram carrying three people arrived. Williams stepped out of the vehicle and asked to see the television. Drake also exited the vehicle, approached Masiongale and said, "Give me my shit." Before Masiongale could answer, Drake shot him. Williams grabbed the television and said, "I got it come on," and the men got back into the vehicle and drove away. While fleeing from the scene, Drake called his mother and "asked for two (2) tickets to California because he thought he just killed somebody." Masiongale was taken to Ball Hospital, where he was pronounced brain dead the next morning and died after being removed from life support.

During the next few days, Williams, Scott, and Adams selected Drake's picture from a police photo array. On October 10, 2004, Drake, who had fled to California, contacted Carlos Kelly, a pastor in San Diego. Two days later, Kelly helped Drake turn himself in to the local law enforcement authorities.

A jury trial was held in February 2006. Drake was represented by two attorneys. Defense counsel's theory was that although Drake was present at the scene, Williams was the shooter. Tr. p. 649. The jury found Drake guilty of murder, and the trial court sentenced him to fifty-five years.

ECF 19-11 at 2-3; <u>Drake v. State</u>, 110 N.E.3d 1190 (Ind. Ct. App. 2018).

In the amended petition, Mr. Drake argues that he is entitled to habeas corpus relief because he didn't receive effective assistance of trial or appellate counsel.

PROCEDURAL DEFAULT

A court considering the merits of a habeas petition , the court must first ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); Lewis v. Sternes, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. Boyko v. Parke, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." Anderson v. Brevik, 471 F.3d 811, 814–815 (7th Cir. 2006) (citing Boyko v. Parke, 259 F.3d at 788). The petitioner must "assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." Lewis v. Sternes, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." Id. "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." Id.

Mr. Drake presented his claim that trial counsel was ineffective with respect to the cross-examination of Jordan Williams to the Court of Appeals of Indiana and the Indiana Supreme Court. ECF 19-9; ECF 19-12. Mr. Drake didn't present his other ineffective assistance of effective counsel claims in the amended petition to the Indiana Supreme Court, and Mr. Drake offers no basis to excuse the procedural default of these claims. As a result, the court can consider only the claims that pertain to the cross-examination of Mr. Williams.

## STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Woods v. Donald, 135 S. Ct. 1372, 1376 (2015).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will

not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Woods v. Donald, 135 S. Ct. at 1376 (internal quotation marks and citations omitted). Criminal defendants are entitled to a fair trial, but not a perfect one. Rose v. Clark, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011).

<u>ANALYSIS</u>

Mr. Drake argues that he is entitled to habeas relief because trial counsel was ineffective with respect to the cross-examination of Jordan Williams. Mr. Drake specifically asserts that trial counsel was ineffective cause they didn't depose Mr. Williams, object to the admission of and testimony about the voice stress tests, review or prepare for the introduction of the stress tests at trial, or request a recess or continuance after learning that Mr. Williams was to testify. He further asserts that Mr. Williams was a "pivotal witness" for the prosecution and that his "credibility was certainly at issue and his impeachment paramount for the defense." ECF 16 at 9, 13.

To prevail on an ineffective assistance of counsel claim, a petitioner must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668 (1984). In determining whether counsel's performance was deficient, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689. This presumption is an important tool to eliminate the "distorting effects of hindsight." Id.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. at 694. In assessing prejudice under Strickland "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied Strickland." McNary v. Lemke, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." Id.

Mr. Williams testified on the second day of trial. On direct examination, he testified that the prosecution told him that the prosecution wouldn't pursue criminal charges against him if he testified truthfully. Trial Tr. 370-371. According to his testimony, Mr. Williams drove to Mr. Drake's apartment with Ronnie Haste on the day of the incident. Id. at 375-376. While Mr. Williams

6

was in Mr. Drake's apartment, he saw Mr. Drake put a revolver in his pants. Id. at 377. Mr. Williams then drove Mr. Drake and Mr. Haste to retrieve a television that Mr. Drake had stolen. Id. at 379-381. Upon arriving at the arranged meeting place, Mr. Williams gut out of the vehicle, walked around the front of the victim's truck, and looked at the television in the driver's seat of the victim's truck. Id. at 381-382. Mr. Williams discussed the price of the television with the victim and then went to pull the television out of the truck. Id. at 382. The victim hesitated and asked Mr. Williams to put the television back in the truck. Id. Mr. Williams then looked at Mr. Drake, who was still inside the vehicle. Id. At this point, Mr. Drake got out and shot the victim. Id. Mr. Williams didn't see Mr. Drake pull the gun, but he heard the shot and saw "fire" coming from the gun. Id. at 382-383. Mr. Williams and Mr. Drake jumped back in the vehicle and drove away. Id. at 382. In the vehicle, Mr. Drake called his mother and asked for two tickets to California "because he thought he just killed somebody." Id. at 385. Mr. Drake called Mr. Williams several times after the shooting to ask Mr. Williams what he had heard and to claim that "there was no way a shell casing would be found because [Mr. Drake] used a revolver." Id. at 387. Mr. Drake also asked Mr. Williams to plead the Fifth. Id. at 390.

Mr. Williams testified on cross-examination that he made his initial statement to police three days after the shooting occurred. Id. at 390-391. Mr. Williams made this statement after the prosecution told him that he wouldn't

be charged if he told the truth. Id. at 393. Trial counsel John Quirk then asked

Mr. Williams about the voice stress testing that took place at that time:

> **Quirk:** And then after that, uh, sometimes in, uh, around March or so the end of February, first of March of 2005, you failed two voice stress tests, is that correct?
>
> **Williams:** Yes.
>
> **Quirk:** And those are all regarding the events of this evening, of that evening, is that correct?
>
> **Williams:** No. I failed questions if I was male or female, living in Indiana, my name is Jordan. I failed every question there was to the test, sir.
>
> **Quirk:** Every single question they asked you, you failed?
>
> **Williams:** Yes.
>
> **Quirk:** Two sets of tests?
>
> **Williams:** Yes.
>
> **Quirk:** One given by a Delaware County Police Officer?
>
> **Williams:** Yes.
>
> **Quirk:** And one given by a Private Investigator here in town?
>
> **Williams:** Yes, sir.

Id. at 394.

Trial counsel then shifted to Mr. Williams's criminal charges, his deal

with the prosecution, and his prior inconsistent testimony about the gun:

> **Quirk:** And then on March 15th or so of 2005, March 16th, I'm sorry, of 2005, you were charged with murder, is that correct?
>
> **Williams:** Yes, sir.

**Quirk:** You were charged with the murder of Christopher Masiongale, is that correct?

**Williams:** Yes.

* * *

**Quirk:** And you've been in the Delaware County Jail since when?

**Williams:** March 18th of last year.

* * *

**Quirk:** And yesterday, I think it was yesterday, around four o'clock or so, four or five o'clock you made another deal with the State of Indiana, is that correct?

**Williams:** Yes.

**Quirk:** And the deal was if you testified truthfully, came in to tell the truth, then they would dismiss everything against you?

**Williams:** Yes, sir.

**Quirk:** And that brings us to today, doesn't it?

**Williams:** Yes, sir.

**Quirk:** What's different from your October 5th statement to today?

**Williams:** Uh, a couple of flaws I mean.

**Quirk:** What?

**Williams:** About me seeing him put the gun in his pants. That's about it.

**Quirk:** That's it?

**Williams:** About it.

* * *

**Quirk:** But there's a big change in your circumstances, isn't it? You can take a seat.

**Williams:** What do you mean?

**Quirk:** Well are you going home tonight?

**Williams:** I don't know.

**Quirk:** You have a possibility of going home tonight?

**Williams:** Probably.

**Quirk:** Due to the deal you made yesterday?

**Williams:** Yes, sir.

* * *

**Quirk:** You never testified that you saw him point a gun at anybody, did you?

**Williams:** No.

**Quirk:** And that's the truth, you never did, right?

**Williams:** What do you mean? Point at Masiongale, is that, I mean?

**Quirk:** Well at anybody that night?

**Williams:** After the gun went off, I was freaked out. I really don't . . .

**Quirk:** Okay. But you didn't see the gun at that particular moment?

**Williams:** No.

**Quirk:** You say, you indicate you saw a flash?

**Williams:** Yes.

* * *

**Quirk:** Now did you have any guns at your house?

**Williams:** Yes, sir.

**Quirk:** What kind of guns did you have?

**Williams:** Uh, I mean I had some rifles, a three eighty handgun, and, uh, I guess they found a nine millimeter there, but I don't know where that came from.

* * *

**Quirk:** Did they find that three eighty handgun at your house?

**Williams:** No, sir.

**Quirk:** Do you know why not?

**Williams:** Yes.

**Quirk:** Why not?

**Williams:** I got rid of it.

**Quirk:** When did you get rid of it?

**Williams:** Uh, after I talked to the police I believe.

**Quirk:** Okay. Where did you put the gun?

**Williams:** Uh, it was, uh, in a dumpster by Hoosier Pete, field by Hoosier Pete.

**Quirk:** Did you just throw it in? Throw it in a field or did you throw it in a dumpster?

**Williams:** Uh, dumpster.

Id. at 394-402.

The prosecution revisited the issue of the failed voice stress tests on redirect examination:

**Prosecution:** Mr. Quirk talked to you a little bit about, uh, you failed a couple of lie detector tests?

**Williams:** Yes.

**Prosecution:** Is that correct, sir?

**Williams:** Yes.

**Prosecution:** Okay. Do you know what type of test you took?

**Williams:** Uh, I forgot what it's called. It is polygraph? Is that what it's called?

**Prosecution:** Sir, I'm going to show you what's been marked as State's Exhibit 19. Do you recognize what this is? Just take a second and look at it. There's three pages to this document. Does that look familiar to you?

**Williams:** Yes. This is the test I took.

**Prosecution:** Okay. Is there a date on there, sir? Do you recognize that date?

**Williams:** Yes, 3-1-05.

**Prosecution:** Is that the date you took that test, sir, that Mr. Quirk talked to you about, uh, the one that you failed?

**Williams:** Yes.

**Prosecution:** Judge, at this time, the State would offer State's Exhibit 19 into evidence. Judge, the State would move State's Exhibit 19 into evidence.

**The Court:** Any objection?

**Quirk:** The only objection that I would have, Your Honor, is that is the first time we've ever seen that document. It wasn't provided in the State's discovery.

**Prosecution:** Judge, I would have to take a second and go through the discovery to ensure that that was provided.

**The Court:** But aside from . . .

**Quirk:** Aside from that, no, I do not have any objection to it.

**The Court:** Alright. Be admitted into evidence.

* * *

**Prosecution:** Now Mr. Quirk, on cross, asked you, he asked you what had changed from your initial statement until today, is that correct?

**Williams:** Yes.

**Prosecution:** And you said at that time, if I'm correct, you said at that time I didn't tell them about the handgun, is that correct, sir?

**Williams:** Yes.

**Prosecution:** On the voice stress test, it indicates that you lied about the handgun, is that correct, sir?

**Williams:** Yes.

**Prosecution:** Part of the deal that you made with someone other than this Deputy Prosecutor was that you had to be completely truthful and honest, is that correct, sir?

**Williams:** Yes, sir.

Id. at 403-408.

In closing arguments, Mr. Drake's attorney stressed that law enforcement never considered whether Mr. Williams was the shooter, even after learning that he threw away a gun in a dumpster. Id. at 648. Trial counsel argued that no matter whose testimony the jury members believed, Mr. Williams was the only person close enough to the victim to shoot him. Id. at 649. He reminded the jury that Mr. Williams struck a deal with the prosecution during Mr. Drake's trial just one day before testifying at trial. Id. at 659. Trial counsel also emphasized the change in Mr. Williams' testimony regarding the gun. Id. at 659-660.

Three eye witnesses other than Mr. Williams also identified Mr. Drake as the shooter. To some degree, the eye witnesses' accounts conflicted with each other as well as with previous statements. Two witnesses identified Mr. Drake as the passenger of the vehicle and the shooter in both a photographic array and at trial. Id. at 121-127, 205-210. A third witness testified that the passenger of the same vehicle was the one who shot the victim. Id. at 255. Another witness testified that he had told Mr. Drake that the victim was selling what he suspected was Mr. Drake's stolen television and that, on the night of the shooting, Mr. Drake asked him if he had heard anything, which the witness perceived as a threat. Id. at 177-184. Yet another witness testified that he heard Mr. Drake say on the telephone that night "get me two tickets to California. I think I killed somebody." Id. at 335. Finally, a pastor testified that he assisted Mr. Drake in California with turning himself in to local law enforcement. Id. at 620-621.

Indiana's court of appeals rejected Mr. Drake's claims that: (1) trial counsel didn't adequately cross-examine and impeach Mr. Williams using the agreement made between Mr. Williams and the prosecution; and that (2) trial counsel didn't make a strategic decision regarding the voice stress tests and should have objected to their admission. First, the appellate court noted that the trial counsel cross-examined Mr. Williams about the last-minute deal made with the prosecution. The appellate court found that Mr. Drake didn't demonstrate that his suggested approach - introducing the specific charges filed against Mr. Williams and the range of possible sentences -- would have

been more effective. As to the voice stress tests, the appellate court noted that trial counsel objected to the voice stress tests on grounds that the prosecution hadn't disclosed them. The appellate court reasoned that the decision not to object to the voice stress tests on other grounds during redirect was strategic in light of the fact that trial counsel had raised them during cross-examination to discredit Mr. Williams's testimony. ECF 19-11 at 10. Because Mr. Drake didn't address the strategic nature of this decision, the appellate court declined to find trial counsel's performance deficient.

This court can't conclude that the state court made an objectively unreasonable decision in rejecting Mr. Drake's ineffective assistance of counsel claim. Mr. Drake specifically argued that that trial counsel should have introduced the charging information against Mr. Williams and the attached penalty during the cross-examination of Mr. Williams. ECF 19-9 at 19-20. Trial counsel elicited testimony from Mr. Williams that he was charged with murder, that he was incarcerated until he made a last-minute deal to testify, that he made inconsistent statements about seeing Mr. Drake put a revolver in his pants, that he didn't actually see Mr. Drake point the gun at the victim, and that he threw away a gun after the murder. Given the comprehensive scope of this cross-examination, it's far from clear that not introducing the specific charges and range of sentences faced by Mr. Williams constituted deficient performance or resulted in prejudice.

Mr. Drake's appellate court didn't expressly address the argument that trial counsel didn't adequately prepare to cross-examine Mr. Williams, but the

decision to deny post-conviction relief on that basis was sound. In <u>Richardson v. United States</u>, our court of appeals held that "[w]hen the alleged deficiency is a failure to investigate, the movant must provide the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced." 379 F.3d 485, 488 (7th Cir. 2004). Mr. Drake offers nothing to suggest that the outcome of the case was likely to have been different if trial counsel had attempted to depose Mr. Williams or if he had asked for a continuance upon learning of Mr. Williams's intent to testify. Nor is it apparent that these omissions constituted deficient performance. Rather, the record indicates that Mr. Williams had already provided exculpatory statements before trial and that Mr. Drake had asked Mr. Williams to assert his Fifth Amendment right to remain silent, which suggests that deposing Mr. Williams would have been redundant, futile, or even contrary to Mr. Drake's interests.

The court of appeals wasn't objectively unreasonable in determining that trial counsel wasn't deficient with respect to the voice stress tests. Though Mr. Drake argues that trial counsel should have objected to the admissibility of the voice stress tests, the record indicates that trial counsel objected to their admission on the basis that they had not seen the tests before trial. Additionally, the state court determination that trial counsel's decision to asking about the stress tests was a strategic decision was not unreasonable. The tests were first brought up at trial when trial counsel introduced the tests on cross to cast doubt on Mr. Williams's credibility by showing that Mr. Williams had made prior inconsistent statements. Further, considering Mr.

Williams's testimony that, during the tests, he failed even basic questions about his name, address, and gender, it seems unlikely that the prosecution's attempt to use these tests to bolstered Mr. Williams's credibility at trial had any impact on the jury's decision. Moreover, trial counsel's other efforts to cast doubt on Mr. Williams's credibility likely offset the prejudice, if any, caused by the voice stress tests as the jury had ample alternative bases for questioning Mr. Williams' testimony.

Finally, even assuming that trial counsel's cross-examination of Mr. Williams was deficient as Mr. Drake alleges, it would remain unclear that Mr. Williams's testimony caused prejudice because the record contains substantial evidence of Mr. Drake's guilt even without Mr. Williams's testimony. Three other eyewitnesses identified Mr. Drake as the shooter; two witnesses testified about the telephone calls Mr. Drake made the night of the shooting, each of which implied that Mr. Drake had shot the victim; and the pastor's testimony that Mr. Drake had fled to California but later turned himself in to law enforcement at least suggested consciousness of guilt. Mr. Drake's claim that trial counsel was ineffective with respect to Mr. Williams's testimony is not a basis for habeas relief.

CERTIFICATE OF APPEALABILITY

Under Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the

denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000). For the reasons explained in this opinion for denying habeas corpus relief, there is no basis for encouraging Mr. Drake to proceed further.

For these reasons, the court DENIES the habeas corpus petition, DENIES the certificate of appealability, and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on November 13, 2019

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT